K7rWdunS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                            18 Cr. 289 (SHS)

5  BRYAN DUNCAN,

6               Defendant.
                                         Sentence
7  ------------------------------x

8                                        New York, N.Y.
                                         July 27, 2020
9                                        11:00 a.m.

10 Before:

11
                        HON. SIDNEY H. STEIN,
12
                                         District Judge
13
                        APPEARANCES
14
   AUDREY STRAUSS
15      Acting United States Attorney for
        the Southern District of New York
16 BY:  NICHOLAS W. CHIUCHIOLO
        Assistant United States Attorney
17
   HALSCOTT MEGARO PA
18      Attorneys for Defendant
   BY:  PATRICK M. MEGARO
19

20

21

22

23

24

25

              SOUTHERN DISTRICT REPORTERS, P.C.•
                       (212) 805-0300

K7rWdunS

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. CHIUCHIOLO:  Good morning, your Honor.  Nicholas |
| 3 | Chiuchiolo on behalf of the United States.  I'm joined by |
| 4 | Special Agent Richard Prince with the Federal Bureau of |
| 5 | Investigation. |
| 6 | MR. MEGARO:  Good morning, your Honor.  Patrick |
| 7 | Michael Megaro on behalf of Mr. Duncan. |
| 8 | THE COURT:  Good morning.  You may be seated in the |
| 9 | courtroom. |
| 10 | Mr. Duncan is present as well. |
| 11 | This is the continuation of the sentencing proceeding |
| 12 | and the conclusion of the sentencing proceeding of Mr. Duncan |
| 13 | in this matter. |
| 14 | For the record, there is a national pandemic |
| 15 | currently, and one of the major hot spots is Florida, where |
| 16 | Mr. Megaro is based.  Mr. Megaro is the attorney who was |
| 17 | substituted in the place of Ms. Al-Shabazz, who asked to |
| 18 | withdraw, and that application was granted.  Unfortunately, |
| 19 | Mr. Megaro has recently tested positive for COVID-19, and |
| 20 | because Florida is a so-called hot spot -- indeed, it has the |
| 21 | highest number of new COVID cases in the country, I believe, |
| 22 | and I believe also recently surpassed New York's high of cases |
| 23 | and the large number of deaths as well.  In any event, |
| 24 | Mr. Megaro would have to quarantine in Florida, and then after |
| 25 | he arrived in New York would have to quarantine for 14 days as |

K7rWdunS

1    well.  It did not make sense for Mr. Megaro to come up, and I

2    think the 14-day period of quarantine has expired in Florida.

3    In any event, there was a telephone conference with Mr. Duncan

4    on the phone in which we decided it made sense for Mr. Megaro

5    to remain in Florida and to participate in the conclusion of

6    the sentencing proceeding by telephone.

7         Now, we have set up a separate line between

8    Mr. Megaro's cell phone and Mr. Duncan's cell phone.  I

9    instructed the marshals to allow Mr. Duncan to bring his cell

10   phone into court.

11        Mr. Duncan, you have the right not only to be present

12   before me during sentencing in court -- and you're here now, so

13   that right is being effectuated -- but you also have the right

14   to have your attorney physically next to you, and that can't be

15   because he's in Florida.  What I've done is, again, with the

16   participation of Mr. Megaro himself, obviously, you can talk to

17   Mr. Megaro at any time you want.  He has his cell phone.  You

18   have your cell phone.  All you have to do is say, "Your Honor,

19   I'd like to talk to my attorney," and then you can go outside

20   and talk to your attorney at any time whatsoever.  And you also

21   have the right to have him speak on your behalf, and because,

22   as you see, he's on the speakerphone here as well as he has his

23   cell phone, he'll be able to do that.

24        Do you understand that, Mr. Duncan?

25        THE DEFENDANT:  Yes, your Honor.

K7rWdunS

1      THE COURT:  And do you agree to proceed in this

2  fashion?

3      THE DEFENDANT:  Yes, your Honor.

4      THE COURT:  All right.  I accept that as a knowing,

5  voluntary and willing waiver to have the attorney physically

6  here.  Actually, I think we've done very well in in that you'll

7  have the complete ability to speak with him privately at any

8  time here.

9      Now, on January 7, I initiated the sentencing

10  proceedings here, and I took the sentencing proceeding almost

11  right to its conclusion.  What I did not do was impose

12  forfeiture and impose restitution because there was an

13  objection at that point.  The government had not yet submitted

14  the restitution, and I believe Ms. Al-Shabazz had an opposition

15  to the forfeiture amount.  So what I have to do today is deal

16  with the forfeiture, deal with the restitution, formally impose

17  sentence, give the appeal rights to Mr. Duncan -- the

18  government has indicated it was going to dismiss the open

19  counts, which I believe are Counts Two and Three -- and set a

20  surrender date, and I intend to do that.

21      There have been a great number of submissions here,

22  increasing in frequency here, as time went on, and indeed, I

23  received a letter.  I think it was filed about nine or ten last

24  night, which was Sunday night, asking for an adjournment, which

25  I denied.  The time has come to conclude this matter.

K7rWdunS

1          Now, I've read everything.  I presided over the trial,

2     so everyone knows I'm quite familiar with it.  I do not need

3     argument on restitution or forfeiture.  Anyone can tell me

4     whatever they like, but I assure you I really don't need

5     additional argument.  We had a full presentation by

6     Ms. Al-Shabazz on behalf of Mr. Duncan.  I will allow

7     Mr. Megaro to tell me whatever he wants, but again, we have a

8     full record here.  And I will allow Mr. Duncan to address the

9     Court as well, with the same statement; I'm fairly comfortable

10    I understand the issues here.  And in the interest of fairness,

11    obviously, I'll let the government say anything it wants.

12         Mr. Megaro, is there anything you wish to bring to my

13    attention?  Again, I repeat I've read all the submissions,

14    including your most recent objection, sir.

15         Mr. Megaro.

16         MR. MEGARO:  Yes.  Thank you, your Honor.

17         There's a couple of things.  I spoke with AUSA Nick

18    Chiuchiolo earlier this morning, and he informed me the

19    government was going to alter the restitution and forfeiture

20    numbers downwardly.  I'm assuming it's in response or in

21    conjunction with the investigation they completed or they at

22    least started very recently and in connection with their

23    application to adjourn the proceedings last night.  I'll

24    address that in a moment, but the only thing -- and I know the

25    Court has read my July 17 submission in its entirety.  There's

K7rWdunS

1    only two things I wish to add.

2         First, I went back over the *Honeycutt* case from the

3    Supreme Court that I cited in my July 17, 2020, submission, and

4    something caught my eye there that I thought was extremely

5    illuminating and would assist this Court.

6         Now, the *Honeycutt* case was a unanimous decision in

7    the Supreme Court, which we don't see very often.  It was only

8    three years ago.  It was an 8-0 decision only because Justice

9    Gorsuch did not take part in the deliberation or consideration

10   of the case, but the *Honeycutt* case dealt with restitution and

11   forfeiture.  And they gave a prime example that I think is

12   particularly appropriate for this case, and I'm going to read

13   it almost verbatim because I couldn't state it any better:

14        An example is instructive.  Suppose a farmer

15   masterminds a scheme to grow, harvest and distribute marijuana

16   on local college campuses.  The mastermind recruits a college

17   student to deliver packages and pays the student $300 each

18   month from the distribution proceeds for his services.  In one

19   year the mastermind earns 3 million.  The student, however,

20   earns $3,600.  If joint and several liability applied, the

21   student would face a forfeiture judgment for the entire amount

22   of the conspiracy's proceeds, 3 million.  The student would be

23   bound by that judgment even though he never personally acquired

24   any proceeds beyond the $3,600.  This case requires

25   determination whether this form of liability is permitted under

K7rWdunS

1    Section 853(a)(1).  The court holds that it is not.

2          And the reason why I bring that up, your Honor, is

3    because that is, I think, precisely what is going on here.  The

4    government is seeking forfeiture and restitution for amounts

5    that my client never actually received.  If he received any

6    proceeds, they were a portion of what the settlement amounts

7    paid out on these allegedly fraudulent claims for.  The

8    attorneys, I believe, are the ones that received the lion's

9    share of the amounts, not my client, and that ties into another

10   argument that I made about proximate responsibility or

11   proximate causation.

12         Mr. Duncan didn't initiate the insurance claims, he

13   didn't initiate litigation, and he didn't settle this case.

14   The attorneys are the ones that are proximately responsible for

15   the litigation settling from insurance companies.

16         Now, regarding restitution, the second thing I wanted

17   to bring up -- I'm turning to that point now -- the government

18   is now changing the restitution amount to remove three out of

19   the six people that were paid out on allegedly fraudulent

20   claims, and I have not been able to do the exact math, but as I

21   understand it, that reduces Mr. Duncan's exposure somewhere in

22   the neighborhood of $400,000 on restitution.

23         Regarding forfeiture, the government has indicated to

24   me that they're going to reduce the amount of forfeiture

25   they're seeking to approximately 40 percent of the original

K7rWdunS

1    amount, which is roughly, instead of 1.6 million, it is now

2    roughly $644,000.  Both of these reductions, in my opinion, and

3    I submit to this Court, indicate that the numbers do not quite

4    add up.  They're not based on what I believe is a sound

5    methodology, and basically, in short, and I'll conclude with

6    this, if the government is not confident in their calculation,

7    then the Court cannot be confident in that calculation.

8            For these reasons, I would ask that the Court not

9    impose restitution and, for the reasons I set forth in my

10   letter, of course, I would ask that the Court not impose the

11   forfeiture amount sought by the government.

12           THE COURT:  All right.  Thank you.

13           Mr. Chiuchiolo, first of all, again, the government

14   submitted, at nine or 10 p.m. last night, its response.  I did

15   not catch that the government was seeking a downward revision.

16   I know you were seeking a revision.  I didn't realize it was

17   downward for both restitution and forfeiture.  Is that correct?

18           MR. CHIUCHIOLO:  That's correct, your Honor.

19           THE COURT:  All right.  You didn't say that hours

20   before this.

21           MR. CHIUCHIOLO:  Your Honor, there's a portion of the

22   forfeiture calculation that the government wanted to further

23   investigate that might upward -- move the forfeiture number

24   upward, but the upshot of our total revisions would move both

25   restitution and forfeiture downwards, and I'm happy to

K7rWdunS

1  elaborate for the Court on that.

2              THE COURT:  I don't know about that yet, right?

3              MR. CHIUCHIOLO:  Correct.

4              THE COURT:  The major part of Mr. Duncan's sentencing

5  was completed on January 7, correct?

6              MR. CHIUCHIOLO:  Correct, your Honor.

7              THE COURT:  All right.  What do you want to tell me?

8  Let's do the bottom line.  What is the forfeiture amount the

9  government is now seeking?  You've submitted a proposed

10  preliminary order of forfeiture, which becomes final upon

11  signing, in the sum of $1,610,140.75; it has some specificity.

12  What is the amount the government is now seeking?

13              MR. CHIUCHIOLO:  Your Honor, this amount the

14  government believes vastly understates the criminal proceeds,

15  but because we are unable to complete our investigation, which

16  we think would move the needle significantly upwards from our

17  revised number that we're bound to articulate, so as to not

18  prejudice the defendant at all, we're going to propose a number

19  that we think vastly understates the total criminal proceeds,

20  which Mr. Megaro stated would be a 60 percent cut, which would

21  be $644,056.33.

22              THE COURT:  Do you mind if I cut the 33 cents?  That's

23  partly facetious.  $644,056, right?

24              MR. CHIUCHIOLO:  Correct, your Honor.  I do have a

25  revised order that notes this number.  I left blank what the

K7rWdunS

1  Court ultimately orders, but if the Court --

2          THE COURT:  Please hand it to my deputy.

3          MR. CHIUCHIOLO:  And just for the record, this is the

4  exact same order that the government previously submitted

5  except that it states in two locations the total amount the

6  government is seeking.  It states the new number and then the

7  number that the Court is ordering just blank so the Court can

8  fill it in.

9          THE COURT:  Yes.

10          Yes, I see on the proposed preliminary order, in the

11  decretal paragraph:  "Now, therefore, it is ordered, adjudged

12  and decreed that," and the sum is entered.  Correct?

13          MR. CHIUCHIOLO:  Correct.

14          THE COURT:  The government is now seeking $644,056.33

15  in forfeiture from this defendant, which I take it is joint and

16  several with Mr. Gordon.  Is that correct?

17          MR. CHIUCHIOLO:  Correct, your Honor.

18          THE COURT:  Let me just make sure that's in this order

19  as well.

20          And this is based on fraud scheme 2.

21          MR. CHIUCHIOLO:  Correct, your Honor.  The government

22  is seeking nothing from fraud scheme 1.  And if I may just

23  explain the government's reasoning on this, your Honor.

24          As the Court knows, the government and the Court

25  received for the first time the defendant's position on

K7rWdunS

1    forfeiture on July 17, which was the government's -- the

2    defendant's really first submission about their objections.

3    They previously, Mr. Duncan previously filed an objection, but

4    it basically just said the defendant is innocent, he shouldn't

5    have to pay a forfeiture.

6              THE COURT:  If I remember correctly, Ms. Al-Shabazz

7    did not respond on the date set by the Court.  Is that correct?

8              MR. CHIUCHIOLO:  Correct, your Honor.  There was a

9    submission that just said we object.

10             THE COURT:  Yes.

11             MR. CHIUCHIOLO:  But it didn't go into any detail, and

12   that's when the Court subsequently ordered the hearing.

13             On July 17, the government received, for the first

14   time, the defendant's position on forfeiture.  We've been

15   looking -- and restitution.  I think the first time the

16   defendant objected to restitution was through this submission.

17             THE COURT:  Yes.

18             MR. CHIUCHIOLO:  So we've been looking at the

19   defendant's arguments and investigating them.

20             On forfeiture, one of the arguments that the defendant

21   raises is a lot of the criminal -- a lot of the proceeds that

22   are listed on D&G's ledger come from non-trip-and-fall

23   accidents, from car accidents, from subway accidents.  So we

24   investigated that claim, principally talking to a cooperating

25   witness who's very familiar with the D&G's operation and its

K7rWdunS

1    revenue.

2           For the record, the government produced those notes to

3    defense counsel in this case.  And the cooperator said

4    essentially, Look, I would have to sit down with you and go

5    through it one by one, but roughly, 40 percent of our cases

6    were trip and falls and the rest were nontrip and falls.  In

7    total, around 80 percent of all cases were fraudulent, but of

8    all the cases, 40 percent were related to trip-and-fall cases.

9           Now, the government, as a matter of law, I don't

10   think, is precluded from seeking forfeiture for all fraudulent

11   cases because the indictment doesn't limit the allegations to

12   trip and falls, but the government recognized that it did not

13   put on proof at trial of non-trip-and-fall cases, so what we're

14   doing is taking the cooperator's statements, we're cutting the

15   60 percent he estimated were non-trip-and-fall cases.

16          Now, what the cooperator also said, the cooperating

17   witness also said was trip-and-fall cases are funded easier.

18   They're funded more quickly than car accidents, than

19   ceiling-collapse cases, so the ledger is going to understate

20   revenues for trip and -- it's going to understate, or I guess a

21   better way to say this is it -- more the revenues on the ledger

22   are going to be from trip-and-fall cases because they're funded

23   more easily.  And the ledger is just, as you know, broker fees.

24   It's amounts that Bryan Duncan and his partner Kerry Gordon

25   received from funding companies.

1          So even though only 40 percent, roughly 40 percent of

2     the cases are trip and falls, the ledger, which we based our

3     forfeiture ask on, is probably going to be 50, 60.  It's going

4     to be larger, represent a larger percentage of trip and falls.

5     And that's what we wanted to further investigate.  So we think

6     this 40 percent number is understates considerably what the

7     total amount of criminal proceeds would be.

8          Also, as your Honor knows, we're not seeking

9     forfeiture from fraud scheme 1.  We're not seeking forfeiture

10     on cash that would have been paid to Mr. Duncan and Mr. Gordon

11     on fraud scheme 2.  So this number is a very conservative

12     number.

13          THE DEFENDANT:  Your Honor, can I speak to my

14     attorney?

15          THE COURT:  Yes, sure.

16          MR. MEGARO:  Your Honor, I just have to mute this

17     phone as I switch over to the other phone.  Bear with me just a

18     moment.

19          THE COURT:  Yes.  Mr. Duncan is leaving the courtroom

20     in order to be able to speak with you.

21          MR. MEGARO:  OK.  Thank you.

22          (Defendant conferred with counsel)

23          MR. MEGARO:  Thank you for the Court's patience, your

24     Honor.  My client's making his way back in right now.

25          THE COURT:  All right.  I've returned.

K7rWdunS

| | |
|---|---|
| 1 | Mr. Megaro, what were you saying?  I see Mr. Duncan in |
| 2 | the courtroom also.  What would you like to say, Mr. Megaro? |
| 3 | MR. MEGARO:  I was just saying thank you for the |
| 4 | accommodation, your Honor.  My client should be making his way |
| 5 | back in, but if the Court wants me to respond -- |
| 6 | THE COURT:  No.  I don't think Mr. Chiuchiolo is |
| 7 | finished because he hasn't said anything about restitution. |
| 8 | Mr. Duncan is in the courtroom. |
| 9 | Why don't you finish up, Mr. Chiuchiolo. |
| 10 | MR. CHIUCHIOLO:  And it is the last point, the last |
| 11 | two points on forfeiture, for the reasons in the government's |
| 12 | submissions, D&G was a fraud mill.  There were tons of |
| 13 | fraudulent cases.  We have detailed citations in our |
| 14 | submissions as to why it's -- I believe the defense position is |
| 15 | only Jasmine Cunningham testified, but there's detailed -- |
| 16 | first of all, it's more than just Jasmine Cunningham on the |
| 17 | ledger.  There's numerous references to other individuals that |
| 18 | are in the record. |
| 19 | THE COURT:  I remember those figures.  The evidence on |
| 20 | fraud scheme 1 and fraud scheme 2 was very substantial, in my |
| 21 | mind, and the jury based its decision on the evidence.  No |
| 22 | question. |
| 23 | MR. CHIUCHIOLO:  So I'll move on, your Honor. |
| 24 | I just want to address very quickly the *Honeycutt* |
| 25 | argument that Mr. Megaro made. |

K7rWdunS

1          THE COURT:  Yes.  I've written on *Honeycutt*.  I

2    understand that case.  Go ahead.

3          MR. CHIUCHIOLO:  Well, the only point I want to make

4    on that is the hypothetical that Mr. Megaro read, of course, is

5    not the case at all here.  There's a, I think the hypothetical

6    involve a mastermind and a low-level worker.  Of course, here,

7    Mr. Duncan and his partner were the masterminds.

8          THE COURT:  On fraud scheme 2.

9          MR. CHIUCHIOLO:  On fraud scheme 2.

10          THE COURT:  And they were participants in fraud scheme

11    1.

12          MR. CHIUCHIOLO:  Exactly.  And again, on forfeiture,

13    we're only seeking forfeiture on fraud scheme 2.

14          THE COURT:  I understand.  They were 50 percent owners

15    of D&G.

16          MR. CHIUCHIOLO:  Exactly, your Honor.

17          THE COURT:  And not only that as opposed to fraud

18    scheme 1, in fraud scheme 2 they were the funders and were

19    taking even a higher cut than Kalkanis was taking.

20          MR. CHIUCHIOLO:  I'll move on from the *Honeycutt*

21    argument.

22          As to restitution, your Honor, based on the

23    defendant's July 17 submission, here, we credit the arguments

24    made as to Colette Ford —

25          THE COURT:  Wait.  I have a chart on each of the six,

K7rWdunS

1    so let me go to that.

2           Yes, sir.  You're deleting your seeking restitution

3    for Ford.

4           MR. CHIUCHIOLO:  Correct.

5           THE COURT:  Correct.

6           MR. CHIUCHIOLO:  Alvin Martin.

7           THE COURT:  Martin.

8           MR. CHIUCHIOLO:  And Anthony Pierre-Paul.  So that's a

9    total reduction of $452,000, meaning the new restitution

10   request from the government is $275,000 -- 275,600 from the

11   government.

12          THE COURT:  All right.  Let me make some notes here.

13          All right.  Thank you.

14          I've heard from the government.  I've heard from the

15   defense on restitution and forfeiture.

16          Mr. Duncan, if there's anything you wish to say, as

17   I've told you, you certainly can tell me whatever you like.  I

18   heard what you had to say the last time, in January.  I think

19   you know my views in terms of your participation in these fraud

20   schemes.  You've heard my telling you about your positive

21   attributes.  As a matter of fact, you've referenced that I

22   think you're smart, I think you're ambitious, I think you're

23   enterprising, I think you have a way with words and you have a

24   way with people.  You were able to bring people into this

25   scheme and work successfully with others.  And I think you have

K7rWdunS

1   a good future ahead of you, but it's a serious crime.  You know

2   that, and it's a shame you used your skills in this manner.

3   You know all that.  You know my views on that.

4           What would you like to tell me, if anything, sir?  And

5   then I will render my decision.

6           THE DEFENDANT:  I just want to ask --

7           THE COURT:  Yes, of course.  You want to talk to your

8   lawyer?

9           MR. MEGARO:  I just want to ask him some questions.

10          THE COURT:  Go ahead.

11          Mr. Duncan is leaving to speak to Mr. Megaro again.

12          MR. MEGARO:  Thank you, your Honor.  I will mute this

13  phone very briefly while I speak with him.

14          THE COURT:  Yes, sir.

15          (Defendant conferred with counsel)

16          THE COURT:  All right.  Mr. Duncan has returned to the

17  courtroom.

18          Can you hear me, Mr. Megaro?

19          MR. MEGARO:  Yes, your Honor.  Thank you again.

20          THE COURT:  Mr. Duncan, what would you like to tell

21  me, if anything?

22          MR. MEGARO:  Your Honor, first I'd like to say thank

23  you for giving my new counsel, Patrick Megaro, an opportunity

24  to submit the objections to the restitution and the forfeiture.

25          As you know, I called your office.  I was real

K7rWdunS

emotional when I spoke to the deputy last month about it, but

I'm really happy that he was able to submit everything.

         With respect to forfeiture, if you simply review --

like I told my attorney, if you simply review the ledge, there

are payments from plenty of entities that aren't even funding

companies.  Just to name a few, and Ms. Al-Shabazz did name a

couple in February, Brooklyn Medical Surgical, Brooklyn Medical

Management.  They have a couple of liaison companies here, and

a few more, Endure Management, but I don't want to go through

all of them right now.  But I'm just saying that when you look

at it, you see that the government, they're just pulling

numbers from everywhere.  We don't really know where they're

getting the numbers from.  That's what I'll say for forfeiture.

         With respect to restitution, if you look at the

restitution order, the government is saying that they're giving

me a reduction.  Those names that were listed on the

restitution order -- Colette Ford, Alvin Martin, Anthony Paul

Pierre -- it's clear as day in the trial record, Alvin Martin

stated several times about his 2014 accident and the government

puts that on the restitution order.

         Anthony Paul Pierre --

         THE COURT:  The government is dropping them.  The

government may be agreeing with your opposition because they

are dropping their requests for restitution based on Ford, on

Martin and on Pierre-Paul.

K7rWdunS

1          THE DEFENDANT:  Yes, Pierre-Paul.  There's a gentleman

2     named David Pierre.  They say they're submitting an exhibit for

3     Anthony Pierre-Paul, but it's a David Pierre email.

4          THE COURT:  Well, we don't have to worry about that at

5     this point because the government is not seeking forfeiture

6     from either of them.

7          THE DEFENDANT:  Your Honor, I understand that.  All

8     I'm saying is that if you look at everything, people are going

9     left and right, up and down.  It's all over the place.  So like

10     I said, I just want you to take that into consideration before

11     you make a decision.

12          THE COURT:  All right.  Thank you.  I understand it.

13          Everybody having spoken, I'm going to do a variety of

14     things to conclude this now.  The first thing was not on my

15     agenda, but I'm going to increase the amount of the variance

16     and decrease the sentence of Mr. Duncan from 80 months to 72

17     months for the same reason.  The variance is for the same

18     reason put on the record on January 7 but with some distance

19     from the trial and the increasing percentage, as I understand

20     it, of nonfraudulent accidents from D&G, although it's still

21     what I think amount to hundreds of accidents, because I think

22     there were at least 300 people involved in D&G, and thinking

23     about the other sentences I've imposed, I do believe that 72

24     months is more appropriate than 80.  Obviously, that's of great

25     importance to Mr. Duncan.

K7rWdunS

1          Let's go to forfeiture.

2          Ms. Al-Shabazz had objected to the proposed forfeiture

3    order of $1.6 million, and now it's $644,056.  I'm going to

4    delete the 33 cents because that gives a false sense of

5    exactitude to this process.  The government is now seeking

6    $644,056 in forfeiture.  As I say, Ms. Al-Shabazz objected to

7    the forfeiture figure.  I ordered a revised proposal to come

8    in.  I deferred the issue of restitution.

9          In terms of forfeiture, "It is well-settled in the

10   Second Circuit that once a defendant is convicted of an offense

11   on proof beyond a reasonable doubt, the government is only

12   required to establish the forfeitability of the property

13   subject to criminal forfeiture as a result of that offense by a

14   preponderance of the evidence" -- and I think that's important

15   here.  *United States v. Schlesinger*, 396 F.Supp.2d 267, 271

16   (E.D.N.Y. 2005) (citing *United States v. Fruchter*, 411 F.3d

17   377, 383 (2d Cir. 2005)), *affirmed* 514 F.3d 277 (2d Cir.

18   2008)).

19         The government has submitted a proposed forfeiture

20   order, pursuant to 18 U.S.C. 981(a)(1)(C) and 28 U.S.C.

21   2461(c), seeking entry of a money judgment -- up until last

22   night, it was $1,610,000, and as I say, now it's $644,056 --

23   which represents the proceeds traceable to the commission of

24   Counts Four, Five and Six.  Under 18 U.S.C. 981(a)(1)(C) "[a]ny

25   property, real or personal, which constitutes or is derived

K7rWdunS

from proceeds traceable" to mail or wire fraud, or a conspiracy

to commit such offense, "is subject to forfeiture to the United

States."  "[T]he term 'proceeds' means property of any kind

obtained directly, or indirectly, as the result of the

commission of the offense giving rise to forfeiture, and any

property traceable thereto, and is not limited to the net gain

or profit  realized from the offense."  *Id.* Section

981(a)(2)(A).

        The government has to establish by a preponderance

that $644,056 constitutes proceeds traceable to Duncan's

criminal conduct by a preponderance, and that the forfeiture

order is going to be joint and several with Mr. Gordon, because

the government is only seeking forfeiture from fraud scheme No.

2, which was the D&G fraud scheme.  And that's Counts Four,

Five and Six of superseding indictment 1.

        "The government is not seeking forfeiture from the

2012 -- 2015 fraud scheme, fraud scheme 1.  Therefore, it's

alleged, and I think it's true, that the forfeiture they're

seeking is a very conservative amount of the total money that

Mr. Duncan obtained from his participating in both fraud

schemes.

        At some point in 2015, Duncan and Gordon stopped

working with Kalkanis and began operating a separate but

substantially similar fraud scheme, and we've always called

that fraud scheme 2.  Duncan and Gordon formed their own

K7rWdunS

company, D&G Premier Solutions LLC, which they used to receive
their case management fees.  (Presentence report at paragraph
26.)  Duncan and Gordon were joint 50-50 owners and were the
company's only employees.  (Trial transcript, 908, 949.)  The
gross profit that D&G made from January 2015 through the end of
2018 was the 1.6 million figure that the government originally
used here.  (Trial transcript at 917; Government Exhibit 807;
presentence report at paragraph 26.)

        Fraud scheme 2 employed many of the same lawyers,
doctors and runners as fraud scheme 1.  (Trial transcript 814
and 1490 and 1491.)  Duncan also used the same primary funding
company.  (Transcript at 814 to 815.)  I do conclude that the
government has proven the much-reduced figure of $644,000 by a
preponderance of the evidence, which is a conservative estimate
of the proceeds traceable to Duncan's criminal conduct.

        The government does not have to prove that every
dollar generated by D&G Premier Solutions LLC was a result of
criminal activity.  "The calculation of forfeiture amount is
not an exact science."  *United States v. Treacy*, 639 F.3d 32,
48 (2d Cir. 2011).  "'The court need not establish the loss
with precision but rather need only make a reasonable estimate
of the loss, given the available information.'"  *Treacy*
(quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir.
2009)).

        Although Duncan identified four clients in the D&G

K7rWdunS

1    ledger who had "legitimate motor vehicle accident[s] or general

2    negligence cases" -- from the July 17 letter of Mr. Megaro that

3    he discussed earlier, at page 9 -- and indeed, the government

4    has indicated that there were legitimate motor vehicle

5    accidents or general negligence cases on the ledgers which were

6    submitted into evidence here -- Duncan failed to substantiate

7    his claims as to legitimate motor vehicle accidents.  Without

8    specific evidence showing that certain claims were fraudulent,

9    his general challenge is unsuccessful.  And again, given the

10   significant reduction from 1.6 million down to 644,000, by a

11   preponderance, that does represent the proceeds Duncan derived

12   from fraud scheme 2.

13          Now, Mr. Megaro also makes an Eighth Amendment claim,

14   saying that this violates the Eighth Amendment prohibition

15   against excessive fines.  There's no merit to that.  I employed

16   the two-step inquiry established in *United States v.*

17   *Bajakajian*, 524 U.S. 321 (1998), for determining whether a

18   financial penalty is excessive.  First, I have to determine

19   whether the excessive-fines clause applies at all.  *United*

20   *States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016).  It does

21   apply, so I then proceed to the second step and determine

22   whether the forfeiture is unconstitutionally excessive.  "The

23   burden rests on the defendant to show the unconstitutionality

24   of the forfeiture."  *Id. Bajakaji*an (citing *United States v.*

25   *Costello*, 611 F.3d 116, 120 (2d Cir. 2010)).

K7rWdunS

1          The excessive-fines clause does apply because the

2     forfeiture order is punitive in nature and "could not have been

3     imposed upon an innocent party."

4          I do assess whether "it is grossly disproportional to

5     the gravity of [Duncan's] offense" using the four *Bajakajian*

6     factors, and applying those factors, each weighs firmly against

7     the finding that the proposed order is grossly disproportional

8     to the gravity of Duncan's offense.

9          Duncan was involved in two separate multiyear

10    conspiracies involving repeated instances of mail and wire

11    fraud to exploit the most vulnerable individuals in our society

12    and to defraud insurance companies.  Everyone remembers the

13    testimony of Mr. Duncan's parking near a homeless shelter and

14    recruiting people from the homeless shelter for his scheme,

15    repeated instances of people actually undergoing serious back

16    surgeries, some of which turned out bad and left people with

17    lasting pain, and the surgeries were absolutely unnecessary.

18    The seriousness and the magnitude of these two fraud schemes is

19    shocking.  People were so poor that sometimes they would ask at

20    first meeting with Kalkanis, the lawyer, or the doctors for

21    food because they didn't have enough money for food and they

22    hadn't eaten.  We heard the testimony.

23         Duncan falls comfortably within those persons for whom

24    the mail and wire fraud statutes were designed, those who use

25    facilities of interstate commerce to engage in fraudulent

K7rWdunS

1   schemes.  *See United States v. Finazzo*, 2014 WL 3818628, at *33

2   (E.D.N.Y. Aug. 12, 2014) *vacated and remanded on other grounds*,

3   850 F.3d 94 (2d Cir. 2017), *and affirmed in part*, 682 F.App'x 6

4   (2d Cir. 2017).

5           Let's not forget that the guideline range here is 324

6   to 405 months.  The maximum fine is $240 million.  The maximum

7   fine is hundreds of times more than the proposed forfeiture

8   order of $644,000, which would certainly suggest that Congress

9   did not view offenses such as Mr. Duncan's as trivial.  That

10  weighs in favor of the forfeiture's constitutionality.  *See*

11  *Viloski*, 814 F.32 at 114; *See United States v. 817 N.E. 29th*

12  *Drive, Wilton Manors, Fla.,* 175 F.3d 1304, 1310 (11th Cir.

13  1999), in terms of the process I engaged in.

14          The nature of the harm caused by Mr. Duncan's conduct

15  was extensive.

16          Now, Mr. Megaro notes, properly, that during our more

17  recent telephone conference of July 10, I acknowledged that it

18  was extremely unlikely that Mr. Duncan would be able to pay a

19  substantial judgment over the course of his lifetime -- that's

20  the defendant's July 17 letter that Mr. Megaro has been

21  referring to, at page 11, citing the July 10 transcript at page

22  15 -- and Mr. Duncan, therefore, urges on the Court that the

23  proposed forfeiture amount would deprive him of his livelihood.

24  That does not follow at all.  Mr. Duncan still has the ability

25  to continue earning his livelihood.  I would hope the

K7rWdunS

1    government does pursue the forfeiture order, assuming the

2    conviction is affirmed.  Mr. Megaro has indicated Mr. Duncan

3    intends to appeal, and it certainly is his right, because he

4    can still rest on his innocence, which is his total right.  But

5    even with the forfeiture order, he'll certainly be able to earn

6    a living.  In fact, the government's better off to the extent

7    Mr. Duncan continues to earn a living after he's released from

8    prison.  The gravity of the conduct and the extensive harm

9    Mr. Duncan caused certainly supports the government's

10   much-reduced proposed figure.  The proposed forfeiture amount

11   is not disproportional to the gravity of Mr. Duncan's conduct,

12   and I reject his Eighth Amendment challenge.

13            I am going to sign the order of forfeiture in the sum

14   of $644,056 joint and several with Mr. Gordon.

15            Now, let's turn to restitution.

16            Restitution is different here.  The government here is

17   seeking restitution from Mr. Duncan for his involvement in

18   fraud scheme 1 only, and the government claims to be including

19   "only those patients who were part of fraud scheme 1 before

20   Mr. Duncan withdrew, or for whom there is evidence showing that

21   Duncan remained involved with their cases."  That's the March 7

22   letter of the government, at page 8.

23            Until today, the government had identified six

24   patients who fit those criteria and calculated the proposed

25   restitution figure at $727,600.  This morning the government

K7rWdunS

1    has indicated that it is dropping its claims for restitution

2    against Mr. Duncan for three patients -- Ms. Ford, Mr. Martin

3    and Mr. Pierre-Paul -- and now it is seeking $275,600 in

4    restitution.

5            I do find the government has not established that that

6    is an appropriate figure for restitution by a preponderance of

7    the evidence.  It is seeking restitution based on Corey

8    Chandler, Byron Thomas and Joseph Toussaint.  Those cases were

9    filed by Marc Elefant, an attorney that began working with

10   Kalkanis at a time when Duncan had already withdrawn from fraud

11   scheme 1.  The government wishes to show that Duncan

12   nonetheless remained involved in those patients' cases by

13   including emails between Duncan and a conspiring doctor.  The

14   emails attach the doctor's daily schedule with the names of 11

15   to 15 patient names, but the government failed to provide any

16   evidence that Duncan was seeking information about these

17   patients specifically.  It has not shown by a preponderance

18   that Duncan remained involved in their cases.

19           I'm not going to enter the government's proposed

20   restitution order.  I do wish to note that the Court's analysis

21   on restitution applies only to Duncan and Kerry Gordon, who

22   withdrew from fraud scheme 1 in 2015 to begin fraud scheme 2.

23   This analysis on restitution is not relevant to those

24   coconspirators who were in fraud scheme 1 and did not withdraw

25   to join fraud scheme 2.

K7rWdunS

| | |
|---|---|
| 1 | All right.  I'm not entering restitution.  I have |
| 2 | entered a forfeiture order.  I have said that I'm going to |
| 3 | impose the 72 months rather than 80 months, the variance, for |
| 4 | the same reasons set forth on January 7, and with everything |
| 5 | else that I said on January 7:  Three years supervised release, |
| 6 | mandatory and standard conditions; no fine, same recommendation |
| 7 | to the Bureau of Prisons.  The reason for variance is the same. |
| 8 | The recommendation is that Mr. Duncan be housed in the tristate |
| 9 | area to facilitate family visits.  And obviously I've adopted |
| 10 | the findings of fact.  Everything from January stays the same |
| 11 | and is part of this proceeding except the change from 80 months |
| 12 | to 72. |
| 13 | MR. CHIUCHIOLO:  Your Honor, just so I understand the |
| 14 | change from 80 to 72, when you say because of the variance, are |
| 15 | you referring to the reasons why the Court varied downward from |
| 16 | the guidelines sentence? |
| 17 | THE COURT:  Yes. |
| 18 | MR. CHIUCHIOLO:  Understood. |
| 19 | THE COURT:  I'm not sure where that question comes |
| 20 | from.  Could there be anything else? |
| 21 | MR. CHIUCHIOLO:  Well, I know that there was arguments |
| 22 | about relative culpability, and that's why I wanted to just |
| 23 | make sure. |
| 24 | THE COURT:  I am thinking about the other sentences |
| 25 | I've imposed, yes. |

K7rWdunS

1          MR. CHIUCHIOLO:  Well, just respect to that issue,

2     which was the relative culpability, it's the government's

3     position that Mr. Duncan was far more culpable than the other

4     two defendants.

5          THE COURT:  OK.  All right.  Thank you.

6          It's six years.  Six years, 72 months.

7          The $100 assessment is due immediately.  I'm sorry.

8     It's not $100.  Just a moment.

9          The $400 assessment is due immediately.  Again,

10    everything from the January sentence.

11         I've employed all of the factors in 3553.  It's

12    appropriate, given the seriousness of the offense and given the

13    need for punishment and deterrence.

14         I'm setting the surrender date as October 2.

15    Mr. Duncan shall surrender for service of sentence at the

16    institution designated by the Bureau of Prisons on or before 2

17    p.m. on October 2, 2020.

18         Mr. Megaro, are you aware of any legal reason why the

19    sentence should not be imposed as I have stated it?

20         MR. MEGARO:  No, your Honor.  There's no reason why

21    sentence should not be imposed.

22         I don't know if the Court wants me to make my

23    objections now or in a moment, because the Second Circuit has

24    taught me the hard way, that if I do not make an objection at

25    the time sentence is imposed, then the issues regarding

K7rWdunS

1    sentence are waived, and I certainly don't want to do that, so

2    I'll leave it to the Court as to when I should bring it up.

3              THE COURT:  Mr. Chiuchiolo, do you know of any legal

4    reason why the sentence should not be imposed as stated?

5              MR. CHIUCHIOLO:  No, your Honor.

6              THE COURT:  I hereby order the sentence to be imposed

7    as stated.

8              Mr. Megaro, why don't you put on the record whatever

9    you wish to put on.

10              MR. MEGARO:  Thank you, your Honor.

11              As I said, the Second Circuit has taught me to object

12    to the sentence and forfeiture order, and I'm not going to

13    belabor the point, but this is going to be based on the reasons

14    set forth by Ms. Al-Shabazz, my predecessor, in her presentence

15    submissions, including her objections to the presentence

16    report, the statements she made on the record on January 7,

17    2020, and all of the proceedings that followed since then, most

18    especially my July 17, 2020, submission as to everything that I

19    said here on the record here today.

20              That being said, I believe my objection has been

21    properly made.  I have advised Mr. Duncan of his right to

22    appeal.  I have been retained to prosecute his appeal, and I

23    will do that with undue delay.

24              There is only one other minor request of Mr. Duncan,

25    if that can be made, and that is concerning the conditions of

K7rWdunS

1    his release.

2            As the Court is well aware, he's more or less been on

3    home confinement since the Court released him, which I believe

4    was May of last year.  He is asking the Court if the Court

5    would consider, perhaps, loosening some of those restrictions

6    to allow him to go outside of the home to run some family

7    errands and spend time with family and to do certain other

8    things in preparation for his surrender on October the 2nd.

9            THE COURT:  What's the position of the government?

10           MR. CHIUCHIOLO:  The government doesn't have an

11   objection to allowing the defendant to leave his home for those

12   reasons articulated by the defense.

13           THE COURT:  All right.  I am going to alter the

14   conditions of home confinement to the extent that Mr. Duncan

15   may leave his home, if he has the permission of his probation

16   officer, for such visits as medical visits and to prepare for

17   his incarceration.  But each time he leaves the home, it will

18   have to be with the permission of his probation officer.

19           Mr. Duncan, you have the right to appeal the sentence

20   I just imposed on you, sir.  If you cannot pay the cost of an

21   appeal, you have the right to apply for leave to appeal *in*

22   *forma pauperis*.  If you make a request, the clerk of court will

23   prepare and file a notice of appeal on your behalf immediately.

24           Do you understand your appeal rights?

25           THE DEFENDANT:  Yes, your Honor.

K7rWdunS

1          THE COURT:  All right.

2          Government, are you moving to withdraw certain counts?

3          MR. CHIUCHIOLO:  Yes, your Honor.  This Court

4    previously declared a mistrial as to Counts Two and Three of

5    the superseding indictment.  At this time the government would

6    move to dismiss Counts Two and Three of the superseding

7    indictment as to Mr. Duncan.

8          THE COURT:  Granted.

9          Anything else, Mr. Chiuchiolo?

10          MR. CHIUCHIOLO:  No, your Honor.  Thank you.

11          THE COURT:  Anything else, Mr. Megaro?

12          MR. MEGARO:  No.  Thank you, your Honor, for your

13    understanding and compassion.

14          THE COURT:  All right.  Thank you, all.  I appreciate

15    it.

16          Good luck to you, Mr. Duncan.  You know how serious I

17    view this crime.  You're going to serve your time in prison and

18    then you'll have met your obligations, assuming you pay the

19    forfeiture, and you'll be able to move on with your life.

20          Thank you, sir.

21          (Adjourned)

22

23

24

25